UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 17-CV-61361-BLOOM/VALLE

CARMELLA A. GELBART

      Plaintiff,

v.

NANCY A. BERRYHILL,
Acting Commissioner of
Social Security Administration,

      Defendant.
_____/

## REPORT AND RECOMMENDATION TO THE DISTRICT JUDGE

THIS MATTER is before the Court on Plaintiff Carmella Gelbart's Motion for Summary Judgment (ECF No. 13) and Defendant Nancy A. Berryhill's, Acting Commissioner of the Social Security Administration, Motion for Summary Judgment (ECF No. 14). United States District Judge Beth Bloom has referred the Motions to the undersigned for a Report and Recommendation. *See* (ECF Nos. 2 and 4).

After due consideration of the record and the parties' briefs, including Defendant's Response (ECF No. 15), having heard oral argument, and being otherwise fully advised on the matter, the undersigned respectfully recommends that Plaintiff's Motion for Summary Judgment (ECF No. 13) be **DENIED**, that Defendant's Motion for Summary Judgment (ECF No. 14) be **GRANTED**, and that the Administrative Law Judge's ("ALJ") Decision be **AFFIRMED** for the reasons set forth below.

## I.    PROCEDURAL HISTORY

On February 14, 2014, Plaintiff Carmella Gelbart ("Plaintiff") applied for disability insurance benefits under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401-434, alleging a disability onset date of October 1, 2009.  (R. 166-72).[1]  Plaintiff's claim was denied initially and again upon reconsideration.  (R. 106-07, 115-16).  Thereafter, Plaintiff requested a hearing, which was held on March 31, 2016 before ALJ Mary Brennan.  (R. 130-31, 62-87).  Plaintiff, appearing with counsel, and a Vocational Expert testified at the hearing.  (R. 62-87).  On April 27, 2016, the ALJ issued a decision denying Plaintiff's application and finding that Plaintiff was not disabled within the meaning of the Act.  (R. 50-57).

Thereafter, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the Commissioner's "final decision."  (R. 31-33); *see Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  Plaintiff now seeks judicial review of the ALJ's Decision.  (ECF No. 1); *see also* 42 U.S.C. § 405(g).  Both parties have moved for summary judgment, and the Motions are ripe for adjudication.  *See* (ECF Nos. 13 and 14).

## II.    STANDARD OF REVIEW

Judicial review of the ALJ's Decision is limited to whether there is substantial evidence in the record as a whole to support the ALJ's finding and whether the ALJ applied the correct legal standards in making her determination.  *Carson v. Comm'r of Soc. Sec.*, 440 F. App'x 863, 864 (11th Cir. 2011) (citing *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004)); *see also* 42 U.S.C. § 405(g).  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Carson*, 440 F. App'x at 864 (quoting *Crawford*, 363 F.3d at 1158); *accord Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987).

---

[1] All references are to the record of the administrative proceeding filed as part of the Defendant's Answer.  *See* (ECF No. 10).

A court, however, "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [ALJ]." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal citation omitted). Even if evidence preponderates against the ALJ's Decision, a court must affirm "if the decision is supported by substantial evidence." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983) (citing 42 U.S.C. § 405(g)). Within this narrow role, however, courts do not act as automatons. *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986). Rather, they "must scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence." *Id.* (citing *Bloodsworth*, 703 F.2d at 1239).

To qualify for benefits, a claimant must be disabled within the meaning of the Act. *See* 42 U.S.C. § 423 (standard for disability insurance benefits). A claimant is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A "physical or mental impairment" is one that "results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

To determine eligibility, the ALJ employs a five-step sequential evaluation:

(1)     Is the person presently unemployed?
(2)     Is the person's impairment severe?
(3)     Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart. P, Appendix 1 (the "Listings")?
(4)     Is the person unable to perform his or her former occupation?
(5)     Is the person unable to perform any other work within the economy?

20 C.F.R. § 404.1520(a)(4) (evaluation process for disability insurance benefits). An affirmative answer to any of the above questions leads either to the next question or, on Steps 3 and 5, to a

3

finding of disability. *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986). A negative answer to any question, other than Step 3, leads to a determination of "not disabled." *Id.*

Importantly, the burden of proof rests on the claimant through Step 4. *See Phillips v. Barnhart*, 357 F.3d 1232, 1241 n.10 (11th Cir. 2004). At Step 4, the ALJ must consider: (i) the claimant's residual functional capacity ("RFC"); and (ii) the claimant's ability to return to her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). The regulations define RFC as that which an individual is still able to do despite the limitations caused by her impairments. 20 C.F.R. § 404.1545(a). The ALJ will "assess and make a finding about [the claimant's RFC] on all the relevant medical and other evidence" in the case. 20 C.F.R. § 404.1520(e). The RFC assessment is used to determine whether the claimant can return to her past relevant work under Step 4, and if so, "the ALJ will conclude that the claimant is not disabled." *Phillips*, 357 F.3d at 1238 (citations omitted). If a claimant cannot return to her past relevant work, then the ALJ proceeds to Step 5. *Id.*

At Step 5, the ALJ considers the claimant's RFC, age, education, and work experience to determine whether the claimant "can make an adjustment to other work." 20 C.F.R. § 404.1520(a)(4)(v); *Phillips*, 357 F.3d at 1239 (citation omitted). The ALJ must determine if there is other work available in significant numbers in the national economy that the claimant has the ability to perform. 357 F.3d at 1239. If the claimant can make the adjustment to other work, the ALJ will determine that the claimant is not disabled. *Id.* Conversely, if the claimant cannot make the adjustment to other work, the ALJ will determine that the claimant is disabled. *Id.* The ALJ may determine whether the claimant has the ability to adjust to other work in the national economy by either: (1) applying the Medical Vocational Guidelines (contained within 20 C.F.R. part 404, Subpart P, Appendix 2); or (2) using a Vocational Expert, who can opine on whether someone with the claimant's limitations can obtain employment in the national economy. *Id.* at 1239-40.

### III.   THE HEARING RECORD

#### A.   Plaintiff's Background and Hearing Testimony

Plaintiff, born in 1958, was fifty-one years old on October 1, 2009, her alleged onset date. (R. 66, 166).  She graduated college with a Bachelor's degree, and had past relevant work experience as an elementary school teacher and a general clerk.  (R. 66, 84, 183, 189).  Plaintiff claimed that she was unable to work due to mental health issues, including anxiety, depression, agoraphobia, and insomnia.  (R. 182).

At the hearing, Plaintiff testified that she stopped working in 2005 (although she alleged disability starting in 2009) to "take care of [her] infirmed parents" full-time.  (R. 67).  Plaintiff worked part-time at her husband's police supply store for some undetermined time, but testified that she stopped working in October 2009 because she "could no longer tolerate working with a store" and "couldn't interact with the customers."  (R. 69-72, 82).  Plaintiff was "incapable of meeting the timely requirement of driving to [her job] facility on time without having a meltdown during the middle of [her] work schedule."  (R. 76).

In response to questions from the ALJ about her mental health treatment, Plaintiff testified that treatment gaps with Dr. Kaplowitz were due to the distance between her home in Weston and the doctor's office in Aventura, since driving worsened her condition.  (R. 70-71).  In addition to in-person visits, Plaintiff claims to have had telephonic counseling sessions with Dr. Kaplowitz three to four times per year.[2]  (R. 70-71, 74-75).  Dr. Kaplowitz prescribed medications, which Plaintiff said were "at least stabilizing" her.  (R. 75).  After two in-person visits with Dr. Kaplowitz (in March 2010 and December 2010), Plaintiff asked to be referred to another doctor closer to home, and she was referred to Dr. Gomez.  (R. 71).  Plaintiff began seeing Dr. Gomez in 2013.  *Id.*

---

[2] There are, however, no records reflecting telephone consults with Dr. Kaplowitz.

Regarding her overall mental health, Plaintiff testified that she had a "mental and nervous breakdown" in 2006 after her parents died, but did not need hospitalization. (R. 73-74). According to Plaintiff, she suffered from "[d]eep depression, shakiness, not being able to focus on any one task, [and an inability to] multi-task." (R. 74). Plaintiff testified that between October 2009 and March 2010, she would have "almost daily" "meltdowns," during which she became hyperverbal, was not able to concentrate or organize her thoughts, would have an increased heartrate and problems separating "fact from emotion." (R. 76). According to Plaintiff, she told Dr. Kaplowitz about these "meltdowns," but never went to the emergency room. (R. 77-78). She stated that she continued to have these symptoms through to the date of the hearing. (R. 78).

Regarding her activities of daily living prior to the date last insured (March 31, 2010), Plaintiff could load the dishwasher and do laundry because these tasks were not "real cumbersome" and did not take much "mental labor." (R. 79). Plaintiff initially did the household shopping, but stopped around March 2010 because she "just could not deal with society and going out and dealing with the activities." (R. 79-80). Plaintiff also testified that she socialized less and less since 2010, and stopped attending her book club meetings or seeing friends. (R. 81-82).

### B.    Vocational Expert's Testimony

The Vocational Expert testified that Claimant's past relevant work included work as an elementary school teacher (light work with an SVP of 7) and general clerk (light with an SVP of 3). (R. 84).

The ALJ posed two questions to the Vocational Expert. (R. 84-85). First, the ALJ questioned the Vocational Expert about a hypothetical individual of Plaintiff's age, education, and previous work experience, who had no exertional limitations but was capable of only simple, routine, repetitive tasks with occasional interaction with coworkers and the public. (R. 84). According to the

Vocational Expert, such an individual could not perform Plaintiff's past relevant work as a teacher or clerk.  (R. 85).  Nonetheless, that individual could perform other jobs in the national economy, such as hand packager, industrial cleaner, and warehouse worker (all jobs with a medium exertional level and an SVP of 2).  *Id.*

Second, if the hypothetical individual of Plaintiff's age, education, and previous work experience needed to be absent from work more than twice a month, then that individual would be precluded from all competitive employment.  (R. 85).

Upon questioning by Plaintiff's attorney, the Vocational Expert testified that a hypothetical individual with the marked limitations expressed in Dr. Kaplowitz's Mental Impairment Questionnaire ("MIQ") (see *infra* Section V.B.2.) would not be able to do Plaintiff's past relevant work or any other work in the national economy.  (R. 85-86).

## IV.    THE ALJ'S DECISION

After reviewing the evidence and conducting the requisite five-step analysis, the ALJ concluded that Claimant "has not been under a disability within the meaning of the Social Security Act since October 1, 2009," the alleged onset date.  (R. 50).

At Step 1, the ALJ determined that Claimant has not engaged in substantial gainful activity since October 1, 2009, the alleged onset date.  (R. 52).

At Step 2, the ALJ found that although Plaintiff's anxiety was a medically determinable impairment, it was not a severe impairment because it did not significantly limit Plaintiff's ability to perform basic work-related activities through the date last insured (March 31, 2010).  *Id.*

Because the ALJ determined that Plaintiff's anxiety was not severe, the ALJ did not proceed to the other steps in the sequential evaluation process and found that Plaintiff was not disabled.  *See* (R. 52-57).

## V.   <u>DISCUSSION</u>

Plaintiff raises various arguments on appeal.  First, Plaintiff argues that the ALJ committed reversible error in finding Plaintiff's anxiety to be a non-severe impairment at Step 2.  (ECF No. 13 at 11-13).  Plaintiff also argues that the ALJ failed to properly weigh the three medical opinions of record.  (ECF No. 13 at 11-17).  Lastly, Plaintiff argues that the ALJ erred in evaluating Plaintiff's testimony.  (ECF No. 13 at 17-20).  As discussed below, the undersigned finds that the ALJ applied the proper legal standards and that the ALJ's Decision is supported by substantial evidence.  Accordingly, the ALJ's Decision should be affirmed.

### A.  The ALJ Properly Concluded that Plaintiff's Anxiety was Not Severe

Plaintiff argues that the ALJ erred at Step 2 by finding that Plaintiff's mental impairment (anxiety) was not severe, despite the opinions of two treating sources (Drs. Barry Kaplowitz and Edwin Gomez) and a one-time examiner (Dr. Carol Seidman).  (ECF No. 13 at 11-17).  More specifically, Plaintiff argues she met the low burden of showing severity because Step 2 is a "threshold inquiry" designed to exclude only "trivial impairments."  (ECF No. 13 at 11-13).

Plaintiff is correct that the burden of establishing the severity of an impairment is "mild." *Gray v. Comm'r of Soc. Sec.*, 426 F. App'x 751, 753 (11th Cir. 2011).  A claimant need only show that her impairment is "not so slight and its effect is not so minimal." *McDaniel*, 800 F.2d at 1031. Nonetheless, an impairment is not severe "if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984).  Similarly, Social Security regulations provide that an impairment is not severe "if

it does not significantly limit [a claimant's] physical or mental ability to do basic work activities."[3] 20 C.F.R § 404.1522(a).  Despite this mild burden, the undersigned finds that Plaintiff has failed to establish that her mental impairment significantly limited her ability to perform basic work activities or that she had any functional limitations resulting from her anxiety.

First, Plaintiff bears the burden of showing that she has a severe mental impairment or combination of impairments that may qualify as a disability.  *Hutchinson v. Astrue*, 408 F. App'x 324, 326 (11th Cir. 2011) (citation omitted).  The severity of a mental impairment is evaluated based on the degree to which the impairment adversely affects or limits the claimant's: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation.  20 C.F.R. § 404.1520a(c)(3); *Cuthbert v. Astrue*, 303 F. App'x 697, 699 (11th Cir. 2008) (citation omitted).

Here, as required by Social Security regulations, the ALJ expressly considered these four broad functional areas to determine whether Plaintiff's mental impairment was severe.  (R. 54-55).  In the first three areas (activities of daily living; social functioning; and concentration, persistence, or pace), the ALJ found that claimant had no limitations prior to March 31, 2010.  (R. 54).  The ALJ also found that there was no evidence that Plaintiff had experienced episodes of decompensation prior to her date last insured.  (R. 54).  Thus, the ALJ concluded: "[b]ecause the claimant's medically determinable mental impairment caused no more than 'mild' limitation in any of the first three functional areas and 'no' episodes of decompensation which have been of extended duration in the fourth area, it was nonsevere."  (R. 54).

---

[3] "Basic work activities" refers to the abilities and aptitudes necessary to do most jobs.  20 C.F.R. § 404.1522(b).   Examples include: (1) physical functions such as walking and standing; (2) capacities for seeing, hearing, and speaking; (3) understanding, following, and remembering simple instructions; (4) using judgment; (5) responding appropriately to supervision, co-workers, and normal work situations; and (6) dealing with changes in the work setting.  *Id.*

Second, as discussed more fully in Section V.B. below, the ALJ clearly articulated various reasons that supported her determination that Plaintiff's mental impairment was non-severe.  Among these, the ALJ references: (1) Dr. Kaplowitz's brief treatment notes, which reflect Plaintiff's mostly normal mental status examination through the date last insured (R. 55-56, 324-25); (2) Dr. Gomez's treatment notes, also reflecting mostly normal mental status examination after the date last insured (R. 56, 263-79, 281-311); (3) Dr. Seidman's report, which was based on a one-time, three hour evaluation of Plaintiff and relied almost exclusively on Plaintiff's subjective reporting (R. 56, 312-23); and (4) the overall lack of objective medical evidence, Plaintiff's lack of treatment and expansive gaps in treatment, lack of hospitalizations, and the inconsistencies between the doctors' treatment notes and their disabling opinions.  (R. 54-57).

To summarize, Plaintiff saw only two doctors—Drs. Kaplowitz and Gomez—for mental health treatment.  (R. 55-56, 243-50, 252-59, 263-79, 281-311, 324-25).  Importantly, as Plaintiff's counsel conceded during the oral argument, *none* of the doctors' treatment notes reflect that Plaintiff's impairment was severe or contain any functional limitations stemming from Plaintiff's mental health.  *See* (ECF No. 31 at 8:7-14); *see also* (ECF No. 22 "Hr'g Tr." 19:11-28:12).  The ALJ also considered Plaintiff's testimony "in light of the totality of the evidence" and concluded that Plaintiff's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record."  (R. 53, 54); *see also infra* Section V.C.

In light of these well-articulated reasons, which are supported by the record (and more fully discussed in Sections B and C, below), the undersigned concludes that substantial evidence supports the ALJ's finding that Plaintiff's anxiety was not a severe impairment.  (R. 52).

### B. The ALJ Properly Weighed the Medical Opinions

Plaintiff next argues that the ALJ erred in giving "little weight" to the opinions of Drs. Kaplowitz, Gomez, and Seidman.  (ECF No. 13 at 20).  According to Plaintiff, the "ALJ erred by rejecting the opinions from three specialists, two of whom treated [Plaintiff] over an extended period of time, and instead relying on her lay interpretation of the treatment notes."  (ECF No. 13 at 20).  For the reasons discussed below, however, the undersigned disagrees.

### 1. *Applicable Law*

Social Security regulations require the ALJ to consider and evaluate every medical opinion received in determining whether a claimant is disabled.  *See* 20 C.F.R. § 404.1527(c) ("Regardless of its source, we will evaluate every medical opinion we receive.").  Medical opinions are "statements from acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1).

In weighing medical opinions, Social Security regulations require an ALJ to consider certain factors, including: (1) whether the claimant has an examining or treating relationship with the medical source; (2) the medical source's area of specialization; (3) whether the medical source's opinion is well-supported; and (4) whether the opinion is consistent with the record as a whole. 20 C.F.R. § 404.1527(c)(i)-(v).

Moreover, an ALJ must generally give controlling weight to the opinion of a treating source[4] about the nature and severity of a claimant's impairments if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c).

When an ALJ does not give controlling weight to a treating source's opinion, the ALJ must "clearly articulate" good cause for discounting it.  *Winschel*, 631 F.3d at 1179 (quoting *Phillips*, 357 F.3d at 1240-41).  "Good cause exists 'when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records.'"  *Id.* (quoting *Phillips*, 357 F.3d at 1241).

The opinion of a consultative examining source, on the other hand, does not merit any special weight, *see McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987), but generally merits more weight than the opinion of a non-examining source, like a State Agency reviewer, *see Broughton v. Heckler*, 776 F.2d 960, 962 (11th Cir. 1985).  Indeed, the opinion of a non-examining source "is entitled to little weight and taken alone does not constitute substantial evidence to support an administrative decision."  *Swindle v. Sullivan*, 914 F.2d 222, 226 n.3 (11th Cir. 1990) (citing *Broughton*, 776 F.2d at 962).  Ultimately, the ALJ can discount even the opinion of a treating

---

[4] A "treating source" is the claimant's own medical source who has provided the claimant with medical treatment or evaluation, and who has had "an ongoing relationship" with the claimant. 20 C.F.R. § 404.1527(a)(2).  An "ongoing relationship" generally means the claimant sees, or has seen, the physician or psychologist "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the claimant's] medical condition(s)."  *Id.*  A medical source who has "treated or evaluated [the claimant] only a few times or only after long intervals (*e.g.*, twice a year)" may be considered a treating source "if the nature and frequency of the treatment or evaluation is typical for [the claimant's] condition."  *Id.*  Conversely, a medical source is *not* a treating source if the relationship "is not based on [the claimant's] need for treatment or evaluation, but solely on [the claimant's] need to obtain a report in support of [the claim] for disability."  *Id.*

physician, as long as the ALJ articulates her reasons, and failure to do so is reversible error. *Lewis v. Callahan,* 125 F.3d 1436, 1440 (11th Cir. 1997); *see also Sryock v. Hecker*, 764 F.2d 834, 835 (11th Cir. 1985) ("The law is clear that . . . the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." (quoting *Oldham v. Schweiker*, 660 F.2d 1078, 1084 (5th Cir. 1987))).

### 2. *The ALJ Properly Weighed Dr. Kaplowitz's Opinion*

Dr. Kaplowitz treated Plaintiff from 1995 through March 31, 2010, Plaintiff's date last insured. (ECF No. 13 at 2); *see also* (R. 252). Notably, however, Dr. Kaplowitz's progress notes reflect only seven visits, the first on August 25, 2006 and the last on September 14, 2012. (R. 324-25). During this six-year period, Dr. Kaplowitz's progress notes are scant, consisting barely of a page and a half of handwritten entries, the longest one (for Plaintiff's first visit in August 2006) being six lines. *Id.* As discussed below, these progress notes reflect long gaps in Plaintiff's treatment and do not contain any limitations stemming from Plaintiff's anxiety. *See id.*

At the August 2006 visit, Plaintiff reported "increased difficulty after the recent death of her mother" and marital problems. (R. 325). Two years later in 2008, Plaintiff returned to Dr. Kaplowitz and complained about ineffective sleep medications. *Id.* Dr. Kaplowitz noted possible attention deficit disorder, anxiety, and sleep disturbance, and prescribed Methylphenidate. *Id.*

Another two years later, on March 3, 2010 (about two weeks before the date last insured), Plaintiff returned to Dr. Kaplowitz. *Id.* At this visit, Dr. Kaplowitz noted that Plaintiff was "doing very well." *Id.* On March 29, 2010, two days before her date last insured, Plaintiff returned for medications and issues of menopause. *Id.* Plaintiff next visited Dr. Kaplowitz on December 22, 2010, and the one-line notation for that visit reflects a refill for Lexapro. *Id.*

Another two years later, in January 2012, Plaintiff returned to Dr. Kaplowitz, and reported doing well with medication.  (R. 324).  Finally, notes from Plaintiff's last visit on September 14, 2012 simply reflect Plaintiff's report of "anxiety over [her] son."  *Id.*

Dr. Kaplowitz's progress notes from 2006 through 2012 contain no examination findings and reflect no serious abnormalities or any resulting limitations.  (R. 324-25).  Nonetheless, despite the dearth of medical evidence to support his opinion, in December 2013—a year after he last treated Plaintiff—Dr. Kaplowitz completed a Psychiatric Impairment Questionnaire ("PIQ") in which he opined that Plaintiff was "markedly limited"[5] in 13 sub-areas and "moderately limited"[6] in 7 sub-areas of functioning, and concluded that Plaintiff was markedly limited in her ability to perform basic work activities.  (R. 255-57).  Dr. Kaplowitz also opined that Plaintiff suffered episodes of deterioration or decompensation in work or work-like settings that caused her to withdraw from that situation and/or exacerbate her symptoms, referencing Plaintiff's report that she stopped teaching because she was distracted and suffered from panic in the car.[7]  (R. 257).  Lastly, Dr. Kaplowitz opined that Plaintiff was incapable of tolerating even low stress work, would be absent more than three times a month, and that her condition existed as of August 3, 2006.  (R. 258-59).

In assigning "little weight" to Dr. Kaplowitz's opinion despite his status as a treating source, the ALJ explained:

> [T]he undersigned finds that there are specific and legitimate reasons to reject Dr. Kaplowitz's unreasonably restrictive assessment and, therefore, accords little weight to the opinions. . . . The totality of the medical records simply fails to support Dr. Kaplowitz's opinions.

---

[5] A limitation is marked if it "effectively precludes the individual from performing an activity in a meaningful manner."  (R. 254).

[6] A limitation is moderate if it "significantly affects but does not totally preclude the individual's ability to perform an activity."  (R. 254).

[7] In contrast, Plaintiff testified at the administrative hearing that she stopped working as a teacher in 2005 to care for her infirm parents.  (R. 67).  Plaintiff told Dr. Seidman the same thing.  (R. 312).

There is absolutely no objective medical evidence prior to March 31, 2010 reflecting the extent of symptomatology endorsed by Dr. Kaplowitz. There is also absolutely no objective medical evidence that the claimant's overall mental condition prior to March 31, 2010 resulted in the type of limitations opined by Dr. Kaplowitz. In fact, the undersigned notes that it was Dr. Kaplowitz himself who noted less than a month prior to claimant's date last insured [that] she was "doing very well" . . . One would expect that with the type of limitations opined by Dr. Kaplowitz, the claimant's treatment notes would be replete with objective medical findings or at least notations regarding the seriousness of her condition. One would also expect Dr. Kaplowitz's minimal treatment notes to be somewhat reflective of the type of severity suggested by his impairment questionnaire if, in fact, his opinions were an accurate depiction of the claimant's condition prior to March 31, 2010. The general lack of objective medical evidence, the lack of treatment obtained by the claimant, and the inconsistency between Dr. Kaplowitz's treatment notes and the opinion in his impairment questionnaire all render Dr. Kaplowitz's opinions less persuasive.

(R. 55-56).

Against this backdrop, the undersigned finds that the ALJ properly gave Dr. Kaplowitz's opinion "little weight" as it was inconsistent with, and unsupported by, the objective medical evidence and his own treatment notes. (R. 55-56, 252-59, 324-25); *see* 20 C.F.R. § 404.1527(c)(3)-(4). Although Dr. Kaplowitz was Plaintiff's treating source, the record contains only one and a half pages of handwritten progress notes spanning six years of treatment. (R. 324-25); *see* 20 C.F.R. § 404.1527(c)(1)-(2) (ALJ considers treatment relationship with the medical source as a factor in weighing an opinion). Moreover, the only pre-DLI treatment notes from Dr. Kaplowitz, dated March 3 and March 29, 2010, reflect that Plaintiff was "doing very well" and had no abnormalities except "issues of menopause." (R. 55, 325). Thus, the ALJ properly concluded that there was no objective medical evidence prior to March 31, 2010 reflecting the extent of symptomology endorsed by Dr. Kaplowitz. (R. 55, 252-59, 324-25); s*ee also* 20 C.F.R. § 404.1527(c)(3) ("the more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion").

Further, the remainder of Dr. Kaplowitz's progress notes, all dated *after* the date last insured, similarly fail to include *any* examination findings, abnormalities, or functional limitations. (R. 55, 324-25). Thus, substantial evidence supports the ALJ's conclusion that Dr. Kaplowitz based his opinion on Plaintiff's self-reports of disabling subjective symptoms, which the ALJ rejected as inconsistent with the record evidence. (R. 56); *see Crawford,* 363 F.3d at 1159 (ALJ properly discounted treating physician's opinion that was inconsistent with his own treatment notes, unsupported by the medical evidence, and appeared to be based primarily on subjective complaints).

### 3. The ALJ Properly Weighed Dr. Gomez's Opinion

Dr. Gomez was Plaintiff's treating psychiatrist from January 2013 through February 2016. (R. 262-78, 286-311). Plaintiff visited Dr. Gomez approximately 20 times, and the visits are reflected in treatment records. *Id.* In addition to the treatment notes, Dr. Gomez authored three opinions regarding Plaintiff's mental health: (i) a PIQ dated November 22, 2013; (ii) a letter dated August 8, 2014; and (iii) an MIQ dated October 30, 2015. (R. 243-50, 279, 281-85, respectively). In each of these opinions, Dr. Gomez found Plaintiff severely limited and unable to work. *Id.*

In explaining her decision to afford "little weight" to Dr. Gomez's opinions, the ALJ stated:

> With regard to Dr. Gomez's opinions, the undersigned notes that he confirmed that he first treated the claimant on January 9, 2013. This, of course, is well after the claimant's date last insured. Nevertheless, Dr. Gomez did state that the claimant's symptoms and limitations went back to the "early 1990's." . . . Once again, outside of the claimant's own subjective complaints, there is absolutely no evidence to corroborate this statement. Without the necessary objective medical evidence, there is no support for the claimant's (or Dr. Gomez's) assertions.

(R. 56).

Plaintiff argues that the ALJ erred in giving Dr. Gomez's opinions "little weight." (ECF No. 13 at 13). Plaintiff asserts that Dr. Gomez's opinions, like Dr. Kaplowitz's opinion, should have been given "controlling weight" because they "are supported by appropriate medical findings and the

ALJ failed to identify any evidence, let alone substantial evidence, contradicting these opinions." (ECF No. 13 at 15).  The undersigned finds this argument unpersuasive and finds that the ALJ properly discounted Dr. Gomez's opinions.

### i. November 22, 2013 Psychiatric Impairment Questionnaire

On November 22, 2013, Dr. Gomez wrote a very restrictive PIQ.  (R. 243-250).  In the PIQ, Dr. Gomez found Plaintiff was "markedly limited" in 16 sub-areas and "moderately limited" in 4 sub-areas of functioning, and concluded that Plaintiff was markedly limited in her ability to perform basic work activities.  (R. 246-48).  Like Dr. Kaplowitz, Dr. Gomez opined that Plaintiff experienced episodes of decompensation or deterioration in work or work-like settings that caused her to withdraw and/or experience an exacerbation in signs and symptoms due to elevated levels of anxiety and panic due to phobias in social and occupational settings.  (R. 248).  Dr. Gomez opined that Plaintiff was incapable of handling even low stress work, and would be absent from work more than three times a month.  (R. 249-50).

At the hearing before the undersigned, the Court questioned Plaintiff's counsel on the treatment notes for the seven office visits that predated Dr. Gomez's PIQ (from January 9, 2013 through November 20, 2013).  (Hr'g Tr. 15:4-18:20).  Throughout these visits, Plaintiff's GAF scores ranged from a low of 60 (in November 2015) to a high of 81-91 (in July and September 2013).  (R. 270, 271, 310).  During the hearing, Plaintiff agreed that from January through September 2013, "all the results of [Plaintiff's] mental status examination[s] . . . have been normal." (Hr'g Tr. 18:16-20).  Given these normal results, the undersigned asked counsel to cite to evidence in the record that would support Dr. Gomez's disabling PIQ opinion.  *Id.* at 19:15-20.  In response, counsel first pointed to Dr. Seidman's consultative examination, but the undersigned pointed out that Dr. Seidman's evaluation came three years *after* this PIQ.  *Id.* at 19:21-25.  Counsel then cited to Dr.

Kaplowitz's records as the only supporting documents for Dr. Gomez's PIQ. *Id.* at 20:1-14. But, as discussed in Section V.B.2. above, nothing in Dr. Kaplowitz's treatment notes would support such a restrictive PIQ.

### ii. August 8, 2014 Letter

Dr. Gomez continued to treat Plaintiff from December 2013 through June 2014. (R. 273-78). During this period, Plaintiff saw Dr. Gomez six more times, and although the doctor noted some anxiety and depression, Plaintiff's GAF scores ranged from 62 to 68 with mostly normal mental status results. (R. 273-77). In particular, during the May and June visits, Dr. Gomez found Plaintiff to be fairly stable, with a GAF score of 68. (R. 277, 278).

Despite these mostly normal visits, Dr. Gomez wrote a letter stating that Plaintiff's condition prevented her from completing job applications, attending job interviews or job fairs, and interacting with others outside of her home. (R. 279). In the August 8, 2014 letter, the doctor concluded that Plaintiff "is not able to perform any kind of work due to her instability." *Id.* Again, as the ALJ noted, there is simply no evidence in the record to support Dr. Gomez's opinion. (R. 56). Moreover, whether a claimant is disabled and unable to work is a matter reserved for the Commissioner, and Dr. Gomez's opinion on this issue is not entitled to any special significance or weight. *See* 20 C.F.R. § 404.1527(d); *Denomme v. Comm'r of Soc. Sec.*, 518 F. App'x 875, 877-78 (11th Cir. 2013) (citations omitted); *Bell v. Bowen*, 796 F.2d 1350, 1353-54 (11th Cir. 1986).

### iii. October 30, 2015 Mental Impairment Questionnaire

Thereafter, Plaintiff saw Dr. Gomez five times between September 2014 and August 2015. (R. 305-09). During these visits, Plaintiff reported anxious mood and panic symptoms, but Dr. Gomez nonetheless found Plaintiff's condition fairly stable or improving, and her GAF scores ranged from 60 to 81. *Id.*

On October 30, 2015, Dr. Gomez completed an MIQ. (R. 281-85). Dr. Gomez opined Plaintiff had "marked limitations" in 14 sub-areas and "moderate to marked limitations" in 8 sub-areas of functioning. (R. 284-85). Dr. Gomez stated that Plaintiff "has been unable to hold a job or deal with home environment stressors due to her persistent anxiety." (R. 283). In addition, Dr. Gomez opined that Plaintiff would be absent from work more than three times a month and that her condition dated back to the early 1990's. (R. 285).

At the hearing, the undersigned again asked Plaintiff to identify the records on which Dr. Gomez was relying to support these marked limitations, but counsel could point to none. (Hr'g Tr. 25:20-26:24). Rather, counsel conceded that Dr. Gomez "failed to point to specific records in his treatment notes" and speculated that Dr. Gomez was "relying on his expertise" when rendering his opinion. *Id.* The exchange below exemplifies the lack of supporting medical evidence for Dr. Gomez's opinions:

> Court: But even though most of her results have been normal, [the doctor is] concluding that she is markedly limited in all these things. That makes no sense.

> Plaintiff's Counsel: I think that's part of psychiatric treatment. I can only go off of the record that I have as well as your Honor, and I do apologize, we do admit it is lacking.

(Hr'g Tr. 26:8-13); *see also* (ECF No. 13 at 14) (similarly conceding that "Dr. Kaplowitz's treatment notes prior to the date last insured are lacking in detail").

Based on the foregoing, the undersigned finds no error in the ALJ's clearly articulated reasons to discount Dr. Gomez's opinions. An ALJ may properly discount an opinion, even from a treating source, when it is inconsistent with the medical evidence or otherwise lacks support in the record. *Phillips*, 357 F.3d at 1240-41; *Crawford,* 363 F.3d at 1159 (ALJ properly discounted treating physician's opinion that was inconsistent with his own treatment notes, unsupported by the

medical evidence, and appeared to be based primarily on subjective complaints).  That is the case here.

First, the undersigned notes that Dr. Gomez began treating Plaintiff three years *after* her date last insured.  (R. 56, 243, 281).  Second, although Dr. Gomez stated in his October 2015 MIQ that Plaintiff's symptoms and limitations went back to the "early 1990's," the ALJ correctly noted that this statement was unsupported by the record and was most likely based on Plaintiff's self-report.[8] (R. 56, 285).  Similarly, Dr. Gomez's November 2013 PIQ notes that Plaintiff's symptom onset date, which Dr. Gomez identified at that time as August 13, 2006, was "[a]s per patient report."[9]  (R. 250). Moreover, Dr. Gomez's own treatment notes, all dated three or more years after the date last insured, show that Plaintiff was well-groomed with good eye contact, was calm and cooperative, and displayed normal activity and speech, clear thought process and content, full orientation, intact memory, normal concentration and attention, and good insight.  (R. 265, 267-71, 277, 288, 293-97, 300, 303, 306).  Dr. Gomez also noted Plaintiff had no anxiety.  (R. 267-71, 274, 277, 293-94, 296-97, 300, 303, 306).  Accordingly, substantial evidence supports the ALJ's assignment of little weight to Dr. Gomez's opinion.

### 4. The ALJ Properly Weighed Dr. Seidman's Opinion

At Plaintiff's counsel request, Dr. Seidman conducted a three hour examination of Plaintiff on March 15, 2016, and then prepared a Psychological Report and MIQ.  (R. 312-18 and 319-23).  In evaluating Plaintiff, Dr. Seidman reviewed Drs. Kaplowitz's and Gomez's medical records, and

---

[8] Indeed, at the hearing before the undersigned, Plaintiff conceded that Dr. Gomez's statement that Plaintiff's disability dates back to the early 1990's "probably come[s] from listening to [Plaintiff] or asking her specific questions . . . about [what] her functioning was during the period of time when she starts to see Dr. Kaplowitz in '95. . . I have to assume it's based on his questions [of Plaintiff]." (Hr'g Tr. 33:10-17).

[9] In fact, as the ALJ explained, both Dr. Kaplowitz and Dr. Gomez appeared to "uncritically accept[] as true most, if not all, of what [Plaintiff] reported," despite the lack of evidence and medical findings to support Plaintiff's complaints before the date last insured.  (R. 56).

considered Plaintiff's subjective reports.  (R. 313, 323).  Plaintiff reported that she retired from her

teaching job in 2005 to care for her parents.  (R. 312).  She also stated that she worked on and off at

her husband's police supply store until it closed in 2009.  *Id.*  While working in that role, Plaintiff

had difficulty with multi-tasking, overstimulation, loss of concentration, focus, anxiety attacks, and

poor attendance.  (R. 312-13).

At this examination, Plaintiff was able to communicate adequately, was cooperative,

pleasant, and oriented to person, place, time and situation.  (R. 314).  Her mood was depressed and

anxious, she had difficulty finding the right words at times, was hyperverbal, with "spotty" attention

and concentration, but normal recent and remote memory.  *Id.*  Psychological testing was consistent

with marked to severe depression, marked to severe anxiety, a panic disorder, "extreme" PTSD, and

marked stress reactions.  (R. 315-16).  Plaintiff's GAF score was 50.  (R. 317).

In the Psychological Report, Dr. Seidman opined that Plaintiff's prognosis was "poor to

guarded," and concluded that Plaintiff was "unable to work" due to her "constant absences, loss of

concentration and attention, and frequent mistakes, recurrent and intrusive recollection of traumatic

experience, recurrent severe panic attacks, autonomic hyperactivity, apprehensive and vigilance and

scanning of her environment, and other symptoms."  (R. 317).  Dr. Seidman added, "[I]t is my

opinion that [Plaintiff] has a medically documented disability with the psychological result that she

is unable to function in a work-related environment dating prior to March 31, 2010."  (R. 318).

In the MIQ, Dr. Seidman reiterated Plaintiff's diagnoses and symptoms.  (R. 319-21). Dr.

Seidman found Plaintiff to be "markedly impaired" in 11 sub-areas and "moderately to markedly

impaired" in six sub-areas.  (R. 322).  Dr. Seidman concluded:

> Reviewing past psychiatric notes by two treating psychiatrists confirm that [Plaintiff]
> has been disabled prior to 3/31/2010. [Plaintiff] remains psychologically disabled in
> my professional opinion and is unable to function, in any capacity, in a work-related
> environment.

(R. 323).

The ALJ afforded this opinion "little weight," stating:

First and foremost, [it] is emphasized that the claimant underwent the examination that formed the basis of the opinions in question not in an attempt to seek treatment for symptoms, but rather, through attorney referral and in connection with an effort to generate evidence for the current appeal.  Further, the doctor was presumably paid for the effort.  Although such evidence is certainly legitimate and deserves due consideration, the context in which it was produced cannot be entirely ignored.

In any event, the undersigned notes that Dr. Seidman's opinions fail on their own accord.  According to Dr. Seidman, the claimant "has a long term medically documented psychiatric history of depression and panic attacks beginning before 2009 and continuing to the present." . . . and has been "unable to function in a work-related environment dating prior to March 31, 2010." . . . Once again, outside of the claimant's subjective complaints, there is no objective evidence substantiating the severity of condition or extent of limitations alleged by the claimant prior to March 31, 2010.

(R. 56).

The undersigned finds that the ALJ properly discounted Dr. Seidman's opinions and clearly articulated her reasons for doing so.  Initially, the undersigned notes that Dr. Seidman is a one-time examiner whose opinion is not entitled to particular weight or deference.  *See McSwain*, 814 F.2d at 619 (unlike treating physicians, opinions from one-time examiners are not entitled to special deference or weight).  Moreover, Dr. Seidman examined Plaintiff six years after the date last insured.  (R. 312, 319).  In addition, the examination was at counsel's request, not for medical treatment.  (R. 312).  Moreover, the ALJ correctly noted that, other than Plaintiff's subjective complaints, there was no objective medical evidence to support Dr. Seidman's conclusion.  (R. 56-57); *see also* 20 C.F.R. § 404.1527(c)(4) ("the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion").

The ALJ noted that, although evidence from Dr. Seidman was "certainly legitimate and deserves due consideration, the context in which it was produced cannot be entirely ignored."

(R. 56); *see* 20 C.F.R. § 404.1527(c)(6) (ALJ properly considers "any factors . . . which tend to support or contradict the medical opinion").   The overriding basis for the ALJ's discounting Dr. Seidman's opinions is the lack of objective evidence to support such severe limitations.  (R. 56) (noting that "[i]n any event, . . . Dr. Seidman's opinions fail on their own accord" because there is "no objective evidence substantiating the severity of condition or extent of limitations alleged by the claimant prior to March 31, 2010.").  As counsel conceded at the hearing before the undersigned, the only records Dr. Seidman relied on to find disability before March 31, 2010 were Dr. Kaplowitz's and Dr. Gomez's records, which are insufficient for this purpose.  (Hr'g. Tr. 30:5-10).

Ultimately, it is the ALJ's duty to weigh the medical evidence.  *Milner v. Barnhart*, 275 F. App'x 947, 948 (11th Cir. 2008) (reiterating that the ALJ is to weigh the evidence and make credibility determinations) (citations omitted).  Here, the ALJ properly weighed the medical opinions, applied the proper legal standards, and substantial evidence supports the ALJ's determination.[10]

### C.  The ALJ Properly Evaluated Plaintiff's Testimony

When considering a claimant's symptoms, the ALJ must follow a two-step process: "Step one is to determine whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms."  *Contreras-Zambrano v. Soc. Sec.*

---

[10] At the hearing before the undersigned, counsel argued for the first time that the ALJ erred by failing to obtain additional medical evidence to more fully develop the record.  (Hr'g Tr. 9:24-10:6, 13:1-15).  First, an ALJ is not required to seek additional expert testimony when, as here, the record contains opinions from several physicians and there is sufficient evidence for the ALJ to make an informed decision.  *Prunty v. Acting Comm'r of Soc. Sec. Admin.*, 635 F. App'x 757, 759-60 (11th Cir. 2015); *Wilson v. Apfel*, 179 F.3d 1276, 1278 (11th Cir. 1999).  Second, although the ALJ has a basic duty to develop a full and fair record, it is Plaintiff who bears the burden of proving that she is disabled and producing evidence to support her claim.  *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003) (citations omitted).  Lastly, arguments made in a perfunctory manner are generally deemed waived.  *N.L.R.B. v. McClain of Georgia, Inc.*, 138 F.3d 1418, 1422 (11th Cir. 1998) (citation omitted).

*Admin., Comm'r*, No. 17-12447, 2018 WL 618420, at *3 (11th Cir. Jan. 30, 2018) (citing SSR 16-3p, 82 Fed. Reg. 49,463-64 (Oct. 25, 2017)).  "Step two is to evaluate the intensity and persistence of an individual's symptoms, such as pain, and determine the extent to which an individual's symptoms limit her ability to perform work-related activities."  *Id.* (citing SSR 16-3p, 82 Fed. Reg. at 49,464-66).  An ALJ considers "whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [her] statements and the rest of the evidence, including [her] history, the signs and laboratory findings, and statements by [her] medical sources or other persons about how [her] symptoms affect [her]."  20 C.F.R. § 404.1529(c)(4).  Moreover, SSR 16-3p, effective March 28, 2016, clarified that "subjective symptom evaluation is not an examination of an individual's character."  82 Fed. Reg. at 49,463.[11]

Here, Plaintiff argues that the ALJ improperly applied the subjective symptom analysis set forth in SSR 96-7p, rather than the standard in the new SSR 16-3p, which became effective one month prior to the ALJ's Decision.  (ECF No. 13 at 17).  The undersigned disagrees.  First, although the ALJ cites to SSR 96-7p, the language of the decision nonetheless makes clear that the ALJ applied SSR 16-3p to evaluate Plaintiff's statements.  For example, the ALJ concluded that Plaintiff's statements were "not entirely consistent with the medical evidence and other evidence in the record."  (R. 54).  Under the prior standard, the ALJ would have used the term "credibility" and included language about whether or not Plaintiff's statements were "credible."  *See* SSR 96-7p, 1996 WL 374186, *1-*2.

Second, upon questioning from the undersigned, Plaintiff conceded that—despite the two citations to SSR 96-7p——the ALJ's evaluation used "exactly the language in the newly adopted SSR 16-3p."  (Hr'g Tr. 35:2-10).  Indeed, the ALJ listed the seven factors in SSR 16-3p in her Decision,

---

[11] SSR 16-3p rescinded SSR 96-7p and eliminated the term "credibility" from SSA's sub-regulatory policy.  82 Fed. Reg. at 49,463.

and then concluded: "[c]onsidering the evidence of record, the undersigned finds that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (R. 54); *see also Burch v. Berryhill*, 16-CV-3524, 2018 WL 683718, at *9 (M.D. Fla. Jan. 16, 2018) (citations omitted), *report and recommendation adopted*, 16-CV-3524, 2018 WL 647469 (M.D. Fla. Jan 31, 2018) (noting an ALJ's typographical error is harmless if the ALJ's decision would be the same despite the error). Thus, the undersigned finds the ALJ's reference to SSR 96-7p was a harmless typographical error.

Moreover, even assuming that the ALJ applied the SSR 96-7p standard, any error would still be harmless because the two rulings employ substantially identical processes for evaluating a Plaintiff's claim of disabling subjective symptoms. *Compare* SSR 16-3p, 82 Fed. Reg. at 49,463, *with* SSR 96-7p, 1996 WL 374186, *1. Indeed, SSR 16-3p expressly states that it replaced SSR 96-7p merely to eliminate use of the term "credibility," recognizing that "subjective symptom evaluation is not an examination of an individual's character." *See* SSR 16-3p, 82 Fed. Reg. at 49,463. Thus, SSR 16-3p "more closely follow[s the] regulatory language regarding symptom evaluation" found in 20 C.F.R. § 404.1529, and that regulatory language remains unchanged. *See* SSR 16-3p, 82 Fed. Reg. at 49,463; *see also* 20 C.F.R. § 404.1529. The ALJ specifically cited 20 C.F.R. § 404.1529 in her decision. (R. 53-54).

Lastly, substantial evidence supports the ALJ's stated grounds for evaluating Plaintiff's testimony. Among other evidence, the ALJ considered that: (i) Plaintiff testified that, during the relevant period, she experienced "meltdowns" a "couple of times a week," but Plaintiff was never hospitalized for any such condition (R. 54, 76-77); (ii) Plaintiff's purported "meltdowns" did not require additional treatment from her treating doctor other than "quarterly" phone calls (R. 55,

77-78); (iii) Plaintiff's general lack of treatment prior to March 31, 2010 directly contradicts her allegations of disability, and the record contains only two progress notes before the date last insured (R. 55, 325); (iv) one would expect a totally disabled individual with the type of symptoms and limitations as alleged by Plaintiff to consistently seek out and obtain medical treatment, and her failure to do so suggests she did not consider her symptoms to be serious enough to warrant any additional intervention (R. 55, 77-78); (v) Plaintiff acknowledged significant gaps in her treating history (R. 55, 70-71, 325); (vi) Plaintiff testified to experiencing frequent meltdowns in March 2010, but contemporaneous treatment notes reveal Plaintiff was "doing very well" and contain no reference to meltdowns (R. 55, 76-78, 324-25); and (vii) although during the administrative hearing Plaintiff described daily activities which were fairly limited, her description of daily activities during the relevant period six years prior cannot be objectively verified with any  reasonable degree of certainty.  (R. 57, 79-80); *see also* 20 C.F.R. § 404.1529(c)(3)(i), (iv), (v), (vii); *see also Dyer v. Barnhart*, 395 F.3d 1206, 1212 (11th Cir. 2005) (citation omitted) (holding a court commits reversible error by disturbing an ALJ's adequately explained subjective symptom determination).

In sum, because the ALJ applied the proper legal standard and supported her findings regarding Plaintiff's allegations of the intensity, persistence, and limiting effects of her symptoms with substantial evidence, the undersigned finds no error.  *See Kieser v. Barnhart*, 222 F. Supp. 2d 1298, 1305 (M.D. Fla. March 8, 2002).

## VI.    <u>RECOMMENDATION</u>

Accordingly, the undersigned respectfully **RECOMMENDS** that Plaintiff's Motion for Summary Judgment (ECF No. 13) be **DENIED,** that Defendant's Motion for Summary Judgment (ECF No. 14) be **GRANTED**, and that the ALJ's Decision be **AFFIRMED** for the reasons set forth above.

Within **fourteen** (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections to any of the above findings and recommendations as provided by the Local Rules for this district. 28 U.S.C. § 636(b)(1); S.D. Fla. Mag. J.R. 4(b) (allowing 14 days for written objections unless a different time is prescribed by the Court).  The parties are hereby notified that a failure to timely object waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions contained in this Report and Recommendation.  11th Cir. R. 3–1 (2018); *see Thomas v. Arn*, 474 U.S. 140 (1985).

**DONE AND ORDERED** at Chambers, in Fort Lauderdale, Florida, on August 22, 2018.

ALICIA O. VALLE
UNITED STATES MAGISTRATE JUDGE

cc: U.S. District Judge Beth Bloom
    All Counsel of Record